Good morning again. Myra Sun for Seneca Neal. And this is a Fourth Amendment case and it's like the house that eventually got searched here. It has many entrances. So I'm going to start with the entrance that began, that's presented by my client's motions. We know that he challenged the adequacy of the search warrant affidavit at this Arctic address and it's number three. That's in the front part of the house. The officers who went there that day had a warrant to search number five on the other side of the house, another what we view as self-contained residence. We think of this as like a multiplex or a fiveplex. Just because you can search one person's part of that dwelling doesn't mean you can search someone else's. So we agree with the magistrate's finding that the expectation of privacy in number three was distinct from number five. We agree that this was a home. There was an entrance hallway, there was a kitchen, and the officers actually went in past the kitchen to see what they saw. So there are three categories of evidence in that warrant affidavit that we attack. First is evidence from the GPS tracker, and that would be the surveillance that they conducted using the GPS tracker that led them to the Arctic address. Do they have a warrant for that? They did get a warrant. I'm going to talk about why that lacked probable cause in our view. Who said cops don't attend CLE? Well, on this one they have to, I think. I mean, I think at least they know about what the Supreme Court says. So the second category of evidence is evidence that they got that day when they went to the Arctic address and went wherever it is they went in the front part of the house. They seized him, they seized his cell phone, and they spoke to him without giving him Miranda rights. In our view, that was an arrest. And then finally, there's a smaller category of evidence obtained after he was arrested, conversations with neighbors. So let me start with the GPS. A GPS warrant still has to have probable cause, and it's just like any other Fourth Amendment location that we search. There has to be a reason to is going to lead to evidence of contraband. Or in this case, I think what they hoped for was the location of contraband, which is to say that would get them to contraband. And so for that, it seems to me there has to be a reasonable basis to believe that the person drives the vehicle and that he drives it for the purpose of storing drugs or transporting drugs. In other words, in our view, the main thing that the officers were able to confirm once they heard from this informant that my client owned this car or had a car like this was that it was registered to him. But after they knew that, all they did was go and see a residence where he was there and the car was there. And I understand that probable cause isn't like being certain, but in fact, registration, a car being registered to you and seeing you with it once doesn't mean that there's probable cause to believe that you're going to find contraband from tracking it. Well, Mr., didn't the informant also say, I've bought drugs from Mr. Neal and he drives that car? I've bought drugs from Mr. Neal. He drives that car. He didn't connect the two. Mr. Neal's a drug dealer, right? Right. So, I mean, you've got, it seems to me you may have better probable cause arguments as to some of the other parts of the search, but as to the tracker, I mean, you have an informant saying that's the guy who I bought drugs for and they went and they checked and lo and behold, the car is at his residence and is registered to him. I understand. Well, what more should they have done to? It seems to me that, um, in the world, people have families and there's a car and it's your wife's car, and then there's a car and it's your car. And it just doesn't seem to me that registration alone is enough to link you to the car. I understand that Mr. Strom said that he was a drug dealer. I understand. They follow the car and then they encounter the girlfriend. They followed the car and they saw conduct that made them believe that there is drug trafficking between him and this young woman. Yes. Um, but that was, I think that was with the, that was with the tracker. I'm sorry. She tells them that the drugs came from Neal? I think that that was after the drug tracker, your honor. So the things that they learned from the surveillance. Did she tell them that Neal lived in this complex? I think that mainly what she did was let them look at her phone and they saw texts between the two of them. That is the primary evidence I believe they got from the young woman. Then they got a warrant to search unit three? Unit five. Unit five. And I don't know what she said in the affidavit for number five is not in this record. It was sealed in the state court. I, I couldn't get it. Um, well, I didn't get it. I didn't get the warrant on. I'm sorry, your honor. They go in to search the unit number three and they see Neal? They go to search number three that they don't have a, they don't, they go to the address. They don't have a warrant to search that front part of the house where number three is with those two doors, the red door and the white door. And once you go into the red door, you're basically in what we regard as the house, his house. Um, and they didn't have a warrant to search that part of the house. And the magistrate found that that was a self-contained home and that they didn't have a warrant to search it and that their entry into that space to see him come out of number three or them standing right outside after they went in and got the lay of the land was illegal. For some reason, they did not, he did not believe that, um, the subsequent seizure of my client was, and the statements and cell phone they got from him should be suppressed. It is of course our view that he should. Um, so on the GPS tracker, we believe there isn't probable cause and I understand that the court disagrees with that. Um, the evidence, um, gotten from their foray into number three is the second category of evidence. And this brings up that body recording, which we did lodge and I think the government lodged. And I just want to remind the court of the chronology briefly. Um, the original suppression motion was filed in August, 2015. That's docket number 66. The government now says that this body recording was reportedly purportedly produced in September of 2015. Um, and that's their supplemental filings, um, which we don't actually think show that the body recording itself was produced. There was some disc labeled it, but they didn't show that that's what that disc was. Um, and then in October, 2015, there was a reply filed. Doesn't mention getting a body recording. The hearing was held in February, 2016. And at that point, um, the officer whose body recording it was didn't testify. And the other one said, I'm not sure there is a body recording. If there is, I haven't listened to it. And then when the hearing was held in February, 2016, he said, the counsel said, I looked into getting this body recording and was told, he does use the word informal. I don't know what that means. He doesn't explain it. But he said, his understanding is there is no recording. So I just want to be very clear that no matter what the government says, the defense did not have this body recording. Hold on. We don't know that. We don't know that. Okay. The defense did not believe it had this body recording for use at the February, 2016 hearing. And I think that that's, well, I can't imagine why that wouldn't be, uh, the case if he didn't, if he would, if he said what he said in docket number 154. Um, and the government doesn't seem to challenge the materiality of that recording to, um, the circumstances of the seizure, uh, and the evidence that was taken then, because a lot of it is recorded, the statements and then the cell phone. Um, I can ask you one thing. We're kind of talking in these vague verbs about whether defense counsel thought or might not have thought that he had a recording. I thought there was a FedEx shipment of evidence and that the recording was in that FedEx shipment. That's what the government is saying. Um, there's a, it's almost like a risk contrary to that, not to the FedEx, your honor. There is a sort of a receipt that I understand defense counsel signed to, to say, yes, I got this package and it's correct. I mean, in theory, what you're supposed to do is look at it, look at what you got and go, oh, wait a minute. This says that's it there. It's not in here. All we have here is that it wasn't signed. I don't think the government lodged a sign sort of acknowledgement of receipt from defense counsel as to that delivery. Um, and I'm sure Mr. Scrockey will correct me if I'm wrong. I'm sure the government will correct me if I'm wrong, but I don't believe he acknowledged receipt of that. So you're saying counsel didn't get it or didn't acknowledge receipt? Didn't acknowledge receipt, which, and there's a place for him to sign if he does. So that means what that means. Um, and we know that at trial, uh, this undamaged record, which they too, um, the same investigators testifying earlier in the day and the government says, um, and they, and they confirm that there's a recording and that's an excerpt of record 95 and 96. Um, yes, there's a recording and the government says, we may come back to that later if we can put that together, which I would argue suggests that it's sort of, he just realized he had it too. And at the end of that trial day, he puts that witness investigator call it back on the stand, excerpt 159. And that's when they play these statements. Um, and then the next day is when the defense brings in the rest of it. So this goes to the government's claim that there is a, um, waiver. And before I go on, I just want to say, we have asked the court to remand and I'm, I would ask the court to consider remanding for some, for some sort of hearing about the production of this recording, because I think that what happened here is that Colt said many things when he testified at the suppression hearing that aren't borne out by that recording. And it seems to me the magistrate ought to know that what he says happened isn't borne out by that recording. Um, and I've, I've often consider what's adduced at trial, um, in ruling on a suppression motion and they can even do that on appeal. And I just have to correct that the footnote to United States versus Thomas, in which I talk about various cases are collected, that's footnote six, not footnote two. And that's at page 26 of my brief. And I'm sorry about that. Not a problem. Okay. So, um, my client didn't waive in part, there are two kinds of waiver the government says happened here. One is that he waived, um, his entire challenge to the search warrant that he made pretrial. Um, and it does seem to me that this is a fairly conventional case. Once you make a motion to suppress evidence, it's not as though you have to, um, object to submission again at trial. And remember it was the government that initially brought in the body recording at trial. They brought it in at the end of day two. My client's lawyer didn't bring it in. What the government did was play part of that recording. And then the defense asked to play the rest of it. Um, and so I don't think he waived by bringing in something that the government had already brought in, um, when it was the subject of a suppression motion that, uh, he'd already made. The other claim that the government says waived, was waived, was waiver of the claims of unlawful arrest and questioning and the phone search that we make, uh, relying on United States versus Nora in our brief. And, um, this was a suppression motion, it seems to me, that was brought. It basically sought suppression of all evidence based on the unlawful entry into number three. And he believed that, it seems to me, that that was in fact an unlawful entry in terms of the seizure of the statements in the phone. At his, um, objections to the adverse findings from the magistrate, which are at clerk's record 154, pages four and five, um, he talks about how he believes the reasoning for admitting it seems flawed, um, to the extent that the evidence obtained subsequent to Mr. Neal's arrest was a direct result and fruit of the officer's unlawful entry into the apartment. That's a quote from that part of his objections. So we don't think he waived that claim either. Um, and next, if it is believed that he... Thank you, Your Honor. Sorry. Good morning, Your Honor. Stephen Scrockey with the U.S. Attorney's Office for the United States. I noticed this morning the calendar mentioned Stephen Cooper was, uh, was doing the argument this morning. Mr. Cooper resigned two weeks ago. We have you substituted. Excellent. Correctly. Thank you. And good morning. Mr. Scrockey? Scrockey, Your Honor. Yes. Scrockey. Any way you see fit to pronounce this. My iPad says my pleasure. Trying to get to the brief, but... I'm going to, I'm going to, uh, go right to the end on this case. Unless you have some questions about the GPS tracker, I'm happy to answer those. But the, the issue here is, does the court really feel based on this record and the facts that they were, the defense has articulated, is there a reason to invoke the exclusionary rule to any aspect of the claims that they're making here this morning? With respect to, um, the issue of the arrest and the troopers going into the common area of the apartment, it's harmless error. All of the, all of the complaints that they're making here this morning, even if they were provided to the court at trial, even if they were suppressed, none of it would have made any difference because at the end of the day, the trial evidence in this case was absolutely overwhelming. We had two cooperating defendants testifying during this trial. We had independent source evidence from the phone records, which is complained about, that his phone was seized, but we had information from Ms. Solomon in text to Mr. Neal the day of the, um, that he provided her with heroin. We have records from phone companies that were introduced at the trial showing numerous thousands of phone calls between Mr. Neal, Mr. Washington, and Mr. Strum, both who testified during the trial with Mr. Neal over time. Mr. Washington did the same thing. We have independent evidence establishing where Mr. Neal lived in apartment number three, the landlord was interviewed, the tenant from number two in the apartment was interviewed. They both described Mr. Neal physically, both described him as somebody who would come and go infrequently, and all that information corroborated, most importantly in this case, the physical surveillance conducted by the troopers outside of what the tracker provided them in information. If the court looks at the record here with the search warrants and the testimony, that tracker was only used three times. The first two times, Mr. Neal went to his residence on Arctic. After that, in five or six, seven times, he did the park a block away from the residence, which was physically surveilled by law enforcement officers, as well as in a plane up above on November 12th. So the tracker argument really doesn't make much sense here because it really didn't carry the day and carry any weight with respect to the law enforcement officers' physical surveillance. Because really, the tracker just tells you where a vehicle goes, doesn't tell you who's driving it, doesn't tell them where it ultimately ended up. And frankly, at the end of the day, the physical surveillance provided the officers in the affidavit more important information in the search warrant than the tracker information, and because it established Mr. Neal was doing things to avoid conduct by law enforcement. So with respect to all of the complaints here, if the court looks at it in terms of, do we need to reverse this case for sentencing, or for a retrial, or for a hearing, it doesn't make any difference. With respect to count seven, even if the court suppresses the evidence from the search of the apartment and the pound of heroin, which had Mr. Neal's fingerprints on it, that doesn't matter either because it's not going to change the sentence at the end of the day. It's only half a kilo, and he was sentenced to six or seven kilos, and it wouldn't matter even if that was suppressed. And that's our contention throughout the whole brief. So unless you have any further questions, I'll reserve my time for my colleague. Thank you. Thank you. Ms. Stouts, would you please put a minute back on the clock to give her some extra time for rebuttal? Thank you, Your Honor. I would disagree with the government's reading of the record that what the government obtained about my client was based on physical surveillance. It began with – there's some testimony in which the officer talks about them getting – we saw a pattern with what the tracker was showing us, and it showed us that he went to a lot of different locations, so you have to narrow those down. What we found is that he was going over to 5402 Arctic on November 6th and 7th. To me, that testimony means that they discovered Arctic from the tracker. So it was not independent. I disagree that the error is harmless. First of all, if you vacate count 7, which we think should happen because the evidence was suppressed, should have been suppressed, if we vacate count 7, then the sentencing package is unbundled. And what we have is – that was actually the only seizure of drugs in this case. The rest of the amount – the rest of the quantity was an extrapolation from the testimony of others. And I just want to quickly note that the seizure of the phone from my client's person really matters because we have many texts and I understand that, but to take the phone from his person means he's the one mobile phone. Thank you. It was submitted. Thank you. United States v. Neil is submitted. I thank both of you for your argument.
judges: Hawkins, McKeown, Owens